IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kelly Lee Parsons, :

    Plaintiff, : Civil Action 2:05-cv-0527

v. : JUDGE SARGUS

Reginald Wilkinson, et al., :

    Defendants.

OPINION AND ORDER

This matter is before the Court for consideration of motions for summary judgment filed by plaintiff Kelly Lee Parsons (Parsons or plaintiff) and by the defendants, all of whom are officials of the Ohio Department of Rehabilitation and Corrections (ODRC) and the Ohio Adult Parole Authority (APA). After thorough review of the parties' motions, the Court concludes that plaintiff's motion for summary judgment should be denied and that defendants' motion for summary judgment should be granted.

I.

Parsons, a state prisoner, brought this action pursuant to 42 U.S.C. §1983 seeking damages, as well as declaratory and injunctive relief, for violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and for violation of the Ex Post Facto Clause. Parsons' constitutional claims, according to his complaint, arise from actions and/or inactions of the ODRC and APA that denied him a meaningful parole hearing and altered the terms and conditions of the judicially sanctioned plea agreement under which he had pleaded guilty to charges of aggravated murder and aggravated robbery. The defendants moved to

dismiss the claim pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. The Court denied the defendants' motion to dismiss in an Opinion and Order dated August 8, 2006, and subsequently appointed counsel to represent Parsons. Both parties have now moved for summary judgment.

II.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388-89 (6th Cir.1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); accord Moore v. Philip Morris Cos., 8 F.3d 335, 340 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain

2

from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial ." Fed.R.Civ.P. 56(e); see Celotex, 477 U.S. at 324; Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. Anderson, 477 U.S. at 251; see Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir.1995); see also Matsushita, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party." Wiley v. United States, 20 F.3d 222, 224 (6th Cir.1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir.1991) (citations omitted). The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. Id.

3

III.

Parsons' summary judgment motion is limited to his claim that defendants, by denying him a meaningful parole hearing when he first became eligible for release, deprived him of due process of law. This motion does not address any of the other claims originally pleaded in his complaint such as denial of equal protection and violation of the Ex Post Facto Clause. Defendants, in their motion, likewise argue that they are entitled to summary judgment on Parsons' due process claim. In addition, however, defendants' motion, *inter alia*, seeks summary judgment on Parsons' equal protection and ex post facto claims. Parsons has not responded to defendants' arguments concerning these other constitutional claims thereby leaving the impression that he may have abandoned them. The Court, nevertheless, will address the equal protection and ex post facto claims before moving on to the parties' principal dispute - whether Parsons has adduced evidence sufficient either to prevail on his due process claim as a matter of law or, at the very least, to permit a reasonable jury to find in his favor on that claim.

A.

The Equal Protection Clause of the Fourteenth Amendment mandates that no state "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, §1. The Sixth Circuit has explained that "to withstand Fourteenth Amendment scrutiny, statutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest." Jackson v. Jamrog, 411 F.3d 615, 618 (6th Cir. 2005) (quoting Richland Bookmart, Inc. v. Nichols, 278 F.3d 570, 574 (6th Cir. 2002)); see also Michael v. Ghee, 498 F.3d 372, 379 (6th Cir. 2007), *petition for cert. filed*, (U.S. March 10, 2008)(No. 07-1156).

4

In Michael, inmates at various Ohio correctional facilities who were sentenced prior to Ohio's enactment of a revised sentencing system in 1996 challenged both the nonretroactivity of the new sentencing scheme and the implementation of guidelines adopted in 1998 by the APA for making release determinations for inmates sentenced before July 1, 1996. These inmates based their challenges, in part, on the Equal Protection Clause. Michael, 498 F.3d at 373. The Sixth Circuit affirmed the district court's grant of summary judgment to the defendants on the inmates' equal protection claim, finding that the district court had properly determined that the inmates failed to allege the violation of a fundamental right or that they were members of a suspect class. Id. at 378-79.

The court of appeals reiterated that there is no fundamental right to parole under the Constitution. Id. (citing Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987)). The panel also reaffirmed that "prisoners are not considered a suspect class for purposes of equal protection litigation." Id. (quoting Jackson, 411 F.3d at 619). Therefore, the inmates could prevail on their equal protection claim only if they could demonstrate that either the defendants' refusal to apply the 1996 sentencing law retroactively or the defendants' implementation of the 1998 guidelines for making release determinations for inmates sentenced before July 1, 1996, lacked a rational basis. Id.

The court held that the inmates could satisfy their burden either by negating every conceivable basis which might support Ohio's actions or by showing that these actions were motivated by animus or ill will. Id. On the other hand, the defendants did not bear any burden of proof. The actions of the legislature and the APA were presumptively valid and could be founded even "on rational speculation unsupported by evidence or empirical data..." Id.

5

(citations omitted).

The defendants in Michael asserted that by expressly limiting the 1996 sentencing law to prospective application only, the legislature intended to address sentencing reform "one step at a time." Id. The court found this explanation constituted a rational basis. Id. (citing Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489 (1955)). The defendants also justified the law's limited application by resort to the often cited rule of construction that "statutes affecting substantive rights and liabilities are presumed to have only prospective effect." Id . (citations omitted). The court likewise found this justification sufficient to satisfy the rational basis standard of review. Id.

With respect to the implementation of the 1998 guidelines, the defendants explained that the previous guidelines that were in effect "did not allow for sufficiently accurate evaluations of inmates' cases, and [they] produced inconsistent results and very low release rates." Id. at 380. The defendants also contended that the impetus of the new guidelines was to "promote a more consistent exercise of discretion, and enable fairer and more equitable decision-making without removing the opportunity for consideration of parole eligibility on an individual case basis." Id. As a result of the inmates' failure to rebut any of these explanations, summary judgment in favor of the defendants was appropriate. Id.

In this case, Parsons may not simply rely on conclusory allegations in his complaint to establish an equal protection violation, but "must set forth specific facts showing that there is no genuine issue for trial." Fed. R. Civ. P. 56(e). He has not done so. Moreover, given the high burden placed on a plaintiff of showing "exceptionally clear proof" to establish an equal protection violation, see Nedea v. Voinovich, 994 F.Supp. 910, 916-17 (N.D. Ohio 1998), and

6

the analysis set forth in Michael, Parsons would have been hard-pressed to survive summary judgment on this claim even had he responded to defendants' arguments.

B.

The Constitution forbids states from enacting ex post facto laws. U.S. Const. art. I, §10, cl. 1. In this case, Parsons alleges in his complaint that the APA's implementation of the 1998 guidelines violated the Ex Post Facto Clause by allowing the parole board to continue a second hearing up to ten years from the date of the initial hearing, while the previous guidelines that were in effect when he was sentenced permitted a continuance of only five years or less. At Parsons' initial parole hearing on November 10, 2003, the APA denied his release and scheduled the next hearing date for November 2011. Because the period between his first and second parole hearings would exceed the five-year limitation of the prior guidelines, Parsons maintains in his complaint that the application of the 1998 guidelines has the effect of increasing the amount of time he may serve and, hence, increase his punishment.

In their summary judgment motion, defendants argue that the new parole guidelines do not run afoul of the Ex Post Facto Clause because they do not, as a matter of law, impose any punishment beyond what the prisoner was already sentenced to. Defendants further contend that Parson's ex post facto challenge necessarily fails because the 1998 guidelines were not legislative in origin, but rather administrative.

As the Sixth Circuit recognized in Michael, 498 F.3d at 381, the defendants' view is inconsistent with the Supreme Court's decision in Garner v. Jones, 529 U.S. 244 (2000). The ex post facto challenge in Garner, in fact, is strikingly similar to Parsons'. Garner involved the retroactive application of a Georgia regulation that extended the interval between the first parole

7

hearing and any subsequent hearings from three years to eight years for prisoners who were then serving life sentences. Id. at 247. The Supreme Court concluded that, on its face, the new regulation did not present a significant risk of lengthening the respondent's sentence since he already was serving a term of life imprisonment. Id. at 256. Nonetheless, the Court remanded the case to the district court to permit the respondent to engage in discovery so that he could attempt to show that the new regulation, in its operation, "created a significant risk of increased punishment for respondent." Id. at 256-57. The Court notably did not draw a distinction between promulgations of the Georgia parole board and the Georgia Legislature for purposes of its ex post facto analysis. See id. at 257 (Scalia, J concurring in part in the judgment).

The Sixth Circuit has determined that "[a]fter Garner, the relevant inquiry ... is not whether the challenged parole regulation is a 'law' or whether the guidelines present a significant risk of increasing the plaintiff's maximum penalty, but rather whether the new guidelines present a significant risk of increasing the plaintiff's amount of time actually served." Michael, 498 F.3d at 383. With respect to whether retroactive application of the 1998 guidelines posed such a risk, the court held that the inmates could establish an ex post facto violation either by demonstrating that the guidelines, on their face, create a significant risk of lengthier imprisonments or by showing that the guidelines, as applied in practice, have resulted "in a longer period of incarceration than under the earlier [guidelines]." Id. at 384 (quoting Garner, 529 U.S. at 255).

Parsons has not come forward with any evidence to demonstrate that a genuine issue of material fact exists as to whether the implementation of the 1998 guidelines would violate the Ex Post Facto Clause either on their face or as applied to him. See id. The Court, therefore,

8

concludes that defendants are entitled to summary judgment on this claim.

C.

In Dotson v. Wilkinson, 329 F.3d 463 (6th Cir. 2003), aff'd 544 U.S. 74 (2005), the court of appeals considered the question of whether state prisoners could challenge under 42 U.S.C. §1983 state parole procedures that they claimed violated their due process rights or whether such claims were cognizable only under a habeas corpus petition. The court held

> where a prisoner does not claim immediate entitlement to parole or seek a shorter sentence but instead lodges a challenge to the procedures used during the parole process as generally improper or improper as applied to his case and that the challenge will at best result in a new discretionary hearing the outcome of which cannot be predicted, we hold such a challenge cognizable under section 1983.

Id. at 472. The holding is particularly important here because Parsons has already challenged the state parole procedures as applied to him in a petition for habeas corpus under 28 U.S.C. §2254 and that petition was denied on the merits. See Parsons v. Ohio Adult Parole Authority, slip op., 2005 WL 1123474 (N.D. Ohio Mar. 30, 2005). Any subsequent habeas petition Parsons might bring on this ground would be subject to dismissal under 28 U.S.C. §2244(b)(1).

To prevail on a procedural due process claim, a plaintiff must show that he has been deprived of a constitutionally protected interest in "life, liberty, or property" without due process of law. Zinerman v. Burch, 494 U.S. 113, 125 (1990) (citations omitted). Where the plaintiff is incarcerated and challenges the procedures under which he is denied parole, it is his liberty interest that is implicated. Inmates at Orient Correctional Institute v. Ohio State Adult Parole Authority, 929 F.2d 233, 235 (6th Cir. 1991).

9

Parsons contends that the State of Ohio has created a liberty interest under which he became entitled to "meaningful consideration for parole" when he first became "eligible for parole at the expiration of his minimum term." See Layne v. Ohio Adult Parole Authority, 780 N.E.2d 548, 555 (Ohio 2002). In Layne, the Ohio Supreme Court held that meaningful consideration is not given when the offense of which the inmate was convicted is disregarded and his parole eligibility is determined by an offense category score that does not correspond to the offense set forth in his plea agreement. Id. The court emphasized, however, "that the APA, when considering an inmate for parole, still retains its discretion to consider any circumstance, relating to the offense ... of conviction..." Id.

In this case, Parsons was convicted of aggravated murder and aggravated robbery and sentenced on August 24, 1990, to an aggregate term of 20 years to life. Under the sentencing law in effect at that time, he would become eligible for parole after 20 years of imprisonment. Because he earned certain credits for good behavior and participating in educational program activities, Parsons actually became eligible for parole in 2003. At his parole hearing on November 10, 2003, Parsons was placed in category 13 under the 2000 parole guidelines which corresponded to his conviction for aggravated murder. With a criminal risk score of 0, Parsons was placed in the applicable guideline range of 300 months to life. Because this calculation was based on the offense for which Parsons was convicted, and not for any other alleged criminal activity that he may have been charged with but which charges were dismissed pursuant to his plea agreement, Layne did not prohibit APA from assigning him to the appropriate guideline range for category 13.

Parsons argues that the Franklin County Court of Appeals has expanded the situation

10

described in <u>Layne</u> as denying "meaningful consideration" to include the circumstance where an inmate is placed within the appropriate guidelines category for the offense of which he was convicted but where the guideline range has a minimum term that exceeds the amount of time an inmate must serve before becoming eligible for parole. See <u>Ankrom v. Hageman</u>, slip op., 2005 WL 737833 at *6 (Ohio App. 10 Dist. Mar. 31, 2005). Although Parsons appears to fit within this circumstance, subsequent decisions of that court have clarified when an inmate has truly been denied meaningful parole consideration. See <u>Eubank v. Ohio Adult Parole Authority</u>, slip op. 2005 WL 2008683 (Ohio App. 10 Dist. Aug. 23, 2005); <u>Ritchie v. Ohio Adult Parole Authority</u>, slip op., 2006 WL 648855 (Ohio App. 10 Dist. Mar. 16, 2006); <u>Larson v. Ohio Adult Parole Authority</u>, slip op., 2006 WL 2976428 (Ohio App. 10 Dist. Oct. 19, 2006).

In <u>Eubank</u>, the inmate was sentenced in 1985 to 10 to 25 years imprisonment for two counts of involuntary manslaughter, one count of aggravated arson, and one count of arson. Under the sentencing law then in effect, Eubank was eligible for parole afer serving seven years. He had his first hearing before the APA in 1991 and was continued four years. A second parole hearing held in 1995 was continued another five years. In 2000, a third hearing was held and was continued ten years. The parole board later rescinded the ten-year continuance and a rehearing took place in 2004. At that fourth hearing, the parole board placed Eubank in a guideline range of 210 to 270 months. Eubank had already served 228 months by that time, but the parole board recommended another continuance for an additional 72 months based in part upon the multiple victims involved and criminal conduct for which Eubank had not been convicted.

Under the above scenario, the appeals court found that by the time of the 2004 hearing, Eubank was already beyond the period for which <u>Layne</u> could provide any relief. <u>Eubank</u>, 2005

WL 2008683 at *3. More importantly, unlike the inmates in Ankrom, Eubank was afforded "meaningful consideration" at the 2004 hearing because he had a genuine possibility of being paroled. Id.

In Ritchie, the prisoner was found guilty of two counts of felonious sexual penetration and four counts of gross sexual imposition, and was sentenced to concurrent prison terms of 15 to 25 years. At Ritchie's initial parole hearing in 2004, the APA utilized parole guidelines adopted in 1998 and revised in 2000 to assign him an offense score of 10 and a risk factor of 3. These factors resulted in an imprisonment range of 150 to 210 months after consideration of Ritchie's outstanding programming achievement while incarcerated. The parole board then continued the next scheduled parole hearing for 210 months.

The court rejected Ritchie's argument that the 2004 hearing was nothing more than a "paper formality." Ritchie, 2006 WL 648853 at *4. The court credited the parole board's explanation that it had denied Ritchie parole not because he had failed to serve the minimum sentence indicated by the guidelines, but because it believed further incarceration was warranted due to the details of his underlying offenses. Id. The court, therefore, concluded that Ritchie had received meaningful consideration for parole at the earliest date of eligibility. Id.

In Larson, the inmate was convicted in 1991 of four counts of rape, one count of gross sexual imposition, and one count of kidnaping. He was sentenced to a minimum term of 15 years and became eligible for parole in 2002. At Larson's first parole hearing, the APA assigned him an offense category of ten because the victim was assaulted by more than one assailant and because Larson had kidnaped the victim in order to carry out the rape. The APA also assigned Larson a risk score of six based on his criminal history and on disciplinary incidents that took

12

place while he was imprisoned. Based on these factors, the APA determined that Larson should serve another 86 months from the date of the hearing.

In finding that Larson did not meet the criteria in Ankrom, the court primarily relied upon the affidavit of a member of the parole board who presided over Larson's 2002 hearing. Larson, 2006 WL 2976428 at *3. The affidavit established that the APA considered Larson's prior pattern of criminal conduct as well as his "repeated assaultive offences" while incarcerated. Id. Accordingly, the court upheld the trial judge's grant of summary judgment to the APA and denial of Larson's cross-motion. Id.

Parsons argues that he was "automatically" placed in category 13 due to his aggravated murder conviction, and that nothing short of proof that he played only a minor role in that offense would have changed his placement in that category. He further contends that because the hearing officer calculated his score prior to the actual hearing, the hearing on November 10, 2003, had no meaningful purpose. This argument is not, however, borne out by the record in this case.

The affidavit of Bernice Maddox, one of the two hearing officers who presided over Parsons' November 10, 2003, parole hearing, supports the APA's position that Parsons was not denied parole because the board somehow deemed him ineligible, but because the panel determined he was not yet suitable for release due to the unusually aggravated nature of his offense. Maddox Aff. ¶7. The deposition testimony of Cynthia Mauser also supports the APA's position. Ms. Mauser is currently the chair of the Ohio Parole Board, but was a hearing officer from 1994 to 2000. Mauser Dep. Tr. pp. 5, 8. She testified at length regarding the application of the guidelines adopted in 1998 and revised in 2000 to prisoners who received indeterminate sentences under the sentencing law in effect prior to 1996. Id. at pp. 10-17. With respect to

13

Parsons, she described how his risk and criminal history scores were calculated and the likelihood that these calculations were performed roughly two weeks before the hearing. Id. at pp. 18-28. Contrary to plaintiff's contention, she explained that these scores had nothing to do with parole eligibility, but were used by the board to help determine release suitability. Id. at pp. 34, 36.

Parsons seems to argue that based on his "limited role" in the offense, he should have been placed in a category less than category 13. He maintains that both the prosecutor and the sentencing judge emphasized his limited role, and that the judge opined, presumably based on Parson's limited role, that he would serve "15 years." A review of the sentencing transcript, however, reveals little support for this argument. What the judge actually said was "It's possible that you [Parsons] could be eligible for parole in, what, about 15 years?" The prosecutor clarified that although the statute provides for eligibility after 20 years but that Parsons' actual time served would be reduced by good-time credit. Transcript of Plea, p.7. As to his supposed limited role, Parsons admitted as part of his plea that he actively participated in the stabbing of the victim. Id. at p. 12. The transcript further reflects that without this admission, the judge would not have accepted the plea. Id. at 11-13.

The evidence in this case that the APA made its decision to deny Parsons parole based on suitability, and not eligibility, is unrebutted. So too is the evidence that the board provided a meaningful hearing to Parsons on November 10, 2003. Parsons' own affidavit belies his contention that he did not receive meaningful consideration. By his own admission, Parsons was permitted to give his version of all the events that led up to the victim's robbery and murder, albeit a version that omitted his own stabbing of the victim. Following this lengthy recitation,

14

the panel specifically asked Parsons why, if his version were true, he had not simply walked away and why he had pleaded guilty if he had not committed the crime. In responding to the latter line of inquiry, Parsons denied admitting to the judge that he had stabbed the victim but, to the contrary, stated that he had never stabbed anyone or even pleaded guilty to aggravated murder. Parsons Aff. ¶¶ 4, 5, 7 ,8 ,9 ,13.

In short, Parsons has not come forward with any evidence to show the existence of a genuine issue of material fact regarding his claim that the APA deprived him of a constitutionally-protected liberty interest without due process of law. Even viewing the record in the light most favorable to Parsons, as the Court must do, plaintiff has produced no evidence upon which a court could find that he was not given meaningful consideration at his November 10, 2003 hearing or that such hearing did not afford him a real possibility of being released. The unrebutted evidence establishes that rather than a "paper formality," the presiding officers considered the details of Parsons' offenses and, based on this consideration, determined in their discretion that he was not yet suitable for parole.

There is also no evidence that defendants altered the terms and conditions of Parsons' plea agreement. Under this agreement, Parsons pleaded guilty to aggravated murder and aggravated robbery in exchange for dismissal of the death penalty specification. Transcript of Plea pp. 4-5, 9, 12. Parsons received a sentence of life imprisonment on the aggravated murder conviction in accordance with his plea agreement. Id. at p. 13. Although the trial judge believed Parsons would be eligible for parole in about 15 years, there were no promises that he would actually be released at that time. Id. at p. 7. Such a decision is committed under Ohio law to the discretion of the APA. See Buhrman v. Wilkinson, 257 F.Supp.2d 1110,1121 (S.D. Ohio

15

2003)(citing former Ohio Rev. Code §2967.03). Furthermore, unlike the scenarios in Layne and Randolph v. Ohio Adult Parole Auth., slip op., 2000 WL 43712 (Ohio App. 2d Dist. Jan. 21, 2000), the APA did not alter Parsons' plea agreement by placing him in a category for an offense other than which he was convicted.

IV.

Lastly, because the Court has determined as a matter of law that no constitutional violations have occurred, it is not necessary to consider defendants' arguments that they are entitled to qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), because their actions did not violate "clearly established rights of which a reasonable person would have known." See Bukowski v. City of Akron, 326 F.3d 702, 708 (6th Cir. 2003) (Court did not reach "clearly established prong" of qualified immunity where officials did not violate plaintiff's due process rights). It is similarly unnecessary to address their arguments concerning lack of personal involvement in the decision at issue or concerning the impact of the PLRA's prohibition against awarding compensatory damages where no physical injury has occurred.

V.

Consistent with the foregoing, plaintiff's motion for summary judgment (doc. 21) is DENIED and defendants' motion for summary judgment (doc. 24) is GRANTED. This case is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment in favor of the defendants.

IT IS SO ORDERED.

Date: 3-25 2008

Edmund A. Sargus, Jr.
United States District Judge

16